IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVE C. BLUFORD, | ) |
| Plaintiff, | ) |
| v. | ) 11 C 6932 |
| SWIFT TRANSPORTATION, a Delaware Corporation, | ) Judge Virginia M. Kendall |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Steve C. Bluford filed a Complaint against his former employer, Defendant Swift Transportation, alleging a violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e, *et seq*. Specifically, Bluford alleges that Swift (1) provided him with less desirable work assignments; (2) mistreated him through verbal abuse and disparagement; and (3) terminated his employment because of his race. Swift now moves for summary judgment, arguing that Bluford is unable to establish race discrimination via either the direct or indirect methods of proof. While Swift concedes that Bluford is a member of a protected class and that his termination constituted an adverse employment action, it contends that Bluford's remaining claims are not materially adverse, Bluford was not meeting legitimate expectations, and Bluford is unable to point to similarly situated employees outside of his class who were treated more favorably. Swift additionally claims that Bluford was terminated because he failed to abide by Federal Motor Carrier Safety Administration ("FMCSA") regulations. Swift argues that this reason was legitimate and non-discriminatory. For the reasons stated herein, the Court grants Swift's motion.

# FACTS[1]

The following facts are undisputed unless otherwise noted.

**A. Bluford's Employment**

In October 2009, Swift, a provider of various transportation services, hired Bluford, an African-American, as an Intermodal Driver for its Chicago Ridge location. (Def. 56.1 St ¶¶ 2, 3, 5). As an Intermodal Driver, Bluford transported containers from rail yards. (*Id.* at ¶ 6). Bluford worked as a day cab driver, meaning that he could transport multiple loads each day but that he did not perform overnight or multiple-day transports. (*Id.*). Bluford initially reported to Justin Cantrell. (Pl. 56.1 St. ¶ 3). That changed in October 2010, when Anthony Young, an African-American, became Bluford's Driver Manager and supervisor. (Def. 56.1 St. ¶ 8). Young reported to Fleet Manager Donovan Rood, a Caucasian, who was located in Phoenix, Arizona. (*Id.*).

When Bluford arrived at work, he would be assigned a truck and a transport assignment, normally determined by Young. (*Id.* at ¶¶ 9-10). Young assigned loads by matching available loads with a driver's projected availability time and a customer's appointment time. (*Id.* at ¶ 10). Sometimes, Bluford would have a pre-trip, which would give him his first job assignment for the day. (*Id.*). Typically, after completing his first delivery, Bluford would use Qualcomm, an internal communication system, or call his driver manager for another assignment. (*Id.* at ¶ 11). Bluford would speak with Rood once or twice a week to either obtain additional assignments or to inform him of any difficulties with a load assigned to him. (*Id.* at ¶ 12). Bluford alleges that Rood would always have a "nasty attitude" with him during their conversations and sometimes

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Swift's Statement have been abbreviated to "Def. 56.1 St. ¶ _"; citations to Bluford's Response to Swift's Statement have been abbreviated to "Pl. Resp. 56.1 St. ¶ _"; citations to Bluford's Statement of Additional Facts have been abbreviated to "Pl. 56.1 St. ¶ _"; and citations to Swift's Response to Bluford's Statement have been abbreviated to "Def. Resp. 56.1 St. ¶ _".

would not respond to Bluford via Qualcomm for over an hour, but Bluford does not know if this had anything to do with his race. (*Id.* at ¶¶ 13-14).

### B. Alleged Racial Discrimination

On May 16, 2012, this Court entered a Memorandum Opinion and Order (Dkt. 28) permitting Bluford to proceed with his Complaint on allegations related to receiving less desirable assignments, mistreatment through verbal abuse and disparagement, and termination of his employment. (Def. 56.1 St. ¶ 22).

#### 1. Less Desirable Work Assignments

Bluford was paid a flat rate of 40 dollars per trip plus 41 cents per mile driven. (*Id.* at ¶ 23). Accordingly, Bluford alleges that having many short assignments as opposed to one long distance assignment created greater earning potential, but Young testified that longer mileage routes amounted to more pay. (*Id.* at ¶ 28). Bluford believes that he was assigned long distance trips because of his race and because he made more money than everyone else. (*Id.* at ¶¶ 24, 27-28). He is not aware of any Swift driver who made more money than he did and he described himself as "the number one man on the list as far as loads, miles, and deliveries." (*Id.* at ¶ 31). On one occasion, Young reassigned one of Bluford's pre-trips and sent him to Napoleon, Ohio instead, but Bluford cannot recall any other specific incidents where a pre-trip was reassigned. (*Id.* at ¶¶ 25-26). Bluford alleges that he would have had a more profitable day had he been able to keep his pre-trip. (*Id.* at ¶ 25). Bluford thought the pre-trip was reassigned to a Caucasian driver. (*Id.*). Although Bluford cannot recall another specific example of a pre-trip being reassigned, he testified that Young would reassign his pre-trips to drivers working at the Manteno, Illinois and Gary, Indiana facilities to keep them busy. (*Id.* at ¶ 26). While Bluford believes that drivers at the Manteno and Gary facilities received his pre-trips and better routes

than he did, he is unaware of how often this occurred or the identity or race of any driver who received better assignments. (*Id.* at ¶¶ 26, 29). Bluford never complained to Young, Rood, or any Swift manager about his concerns regarding reassignment of pre-trips because he thought he would "stir up trouble." (*Id.* at ¶ 30).

Bluford maintains that Swift would send better trucks to Gary and Manteno while sending broken trucks to his location because the intermodal drivers at Chicago Ridge were primarily African-American. (*Id.* at ¶¶ 33-34). However, the Manteno facility had no Intermodal Drivers assigned during the pertinent timeframe and both the Gary and Chicago Ridge facilities' Intermodal Driver populations were majority African-American. (*Id.* at ¶ 34). During Bluford's employment, Young assigned trucks to drivers. (*Id.* at ¶ 35). Bluford alleges that he would receive the least favorable trucks two to three times per week, but he does not believe he was assigned those trucks because of his race. (*Id.* at ¶ 36). He contends that trucks in better working condition were assigned to drivers of noncolor, but concedes that Caucasian drivers were also assigned trucks that would break. (*Id.* at ¶ 32). Being assigned a truck with a mechanical problem could cause drivers to lose money because they were paid by the mile, but drivers received breakdown pay if a truck broke down during transportation and the pay was approved by a Driver Manager. (*Id.* at ¶ 37). Bluford never complained to Young about the trucks. (*Id.* at ¶ 38).

### 2. Verbal Abuse

In general, Bluford believes Rood harassed him at least partially due to his race because of Rood's "attitude" toward him. (*Id.* at ¶ 51; Pl. Resp. 56.1 St. ¶ 52). Bluford felt Rood demeaned him by yelling at him as if he was one of Rood's children; however, he does not know if Rood spoke in the same manner to others. (Def. 56.1 St. ¶ 51).

Prior to Young becoming the Driver Manager at the Chicago Ridge facility in October 2010, Rood temporarily held the role. (*Id.* at ¶ 39). One day, Bluford alleges he overheard Rood talking on the phone and say, "Man, I'm getting sick of coming up here babysitting these monkeys." (*Id.*). Rood denies making the comment, but it is undisputed that he never saw Bluford, no one else was present, and Bluford did not report the comment. (*Id.* at ¶¶39-40). Bluford never heard any other race-based comments made by either Rood or Young during his employment with Swift. (*Id.* at ¶ 41).

Bluford also alleges that during a 2010 pickup assignment to Kenosha, Wisconsin where he was delayed, Rood called him four to seven times to determine if he had been loaded. (*Id.* at ¶ 43-44). Rood informed Bluford that he was checking on his loading status because Bluford was delivering a hazmat load that required paperwork to be sent to the receiving rail yard before he could complete the delivery. (*Id.* at ¶ 45). Bluford believes that Rood was harassing him by calling him multiple times over a single shipment because Rood did not call other drivers repeatedly over a single delayed shipment. (*Id.* at ¶ 46; Pl. Resp. 56.1 St. ¶ 44). Rood testified that three to four times per week he will call drivers to check their status. (Def. 56.1 St. ¶ 46).

On another occasion, Bluford had a flat tire while in Sturtevant, Wisconsin. (*Id.* at ¶ 48). Bluford thinks Rood harassed him due to his race on this occasion because, although Bluford was only supposed to work a half-day, Rood required him to stay with the load. (*Id.*). Bluford contends it did not matter who picked up the load so long as it was picked up. (*Id.*). Bluford alleges another instance of harassment when he was in Gary to pick up an assigned load. (*Id.* at ¶ 49). As Bluford was preparing to depart, Rood called and told him to take a different load going to Brownsville, Indiana, where Bluford would drop that load and bring another back from Brownsville. (*Id.*). Bluford told Rood that he did not have enough hours left to make the trip and

in response, Rood sent him home. (*Id..* at ¶ 50). Finally, Young once threatened to write Bluford up if he would not drive a truck that Bluford felt did not meet standards; however, he was never written up nor does he think that Young was threatening him due to his race. (*Id.* at ¶ 53).

**C. Disciplinary History**

Bluford worked without any complaints or incidents until Young became his supervisor in October 2010. (Pl. 56.1 St. ¶ 3). On December 30, 2010, Bluford received a first and final written warning from Young in the form of a Performance Counseling Report ("PCR"). (Def. 56.1 St. ¶ 55). The PCR stated that Bluford was counseled for (1) hiding the key to truck 304157 on December 17, 2010; (2) making accusations and threats to another driver on December 20, 2010; and (3) not following instructions by failing to have truck 19957 jump-started and taken to the Gary facility for repairs. Bluford admits the PCR states as much, but claims that each of the events was falsified. (*Id.* at ¶ 56; Pl. Resp. 56.1 St. ¶ 56). Bluford denies hiding the key or making any threatening remarks to a fellow employee. (Def. 56.1 St. ¶¶ 57, 60). On December 21, 2010, Young met with Bluford and the other driver and told them to "knock off" any argument regarding the key. Young told them not to worry about any altercation and not to let it happen again. (Def. 56.1 St. ¶ 61). Bluford received the written PCR while the other driver, a Caucasian, received a verbal warning. (Pl. Resp. 56.1 St. ¶ 62). Additionally, Bluford maintains that he tried to get truck 19957 jumped but that it would not start; however, Young testified that the truck was running later that morning. (Pl. Resp. 56.1 St. ¶ 63; Def. 56.1 St. ¶ 64).

Bluford maintains that when Young presented him with the PCR, Young told him that Rood had told Young to write him up. (Def. 56.1 St. ¶ 65). Rood and Young testified that it was Young's decision to issue the PCR. (*Id.*).

**D. Termination**

On January 5, 2011, Glenn Dailey, another Intermodal Driver, reported the unsafe condition of a container to Driver Manager Ron Spain. (*Id.* at ¶ 67). Prior to terminating Bluford, Rood reviewed an email from Dailey regarding the unsecured container. (*Id.* at ¶ 68). Rood asked Spain or Young to investigate the container at issue. (*Id.*). Both Dailey and David Wiltfrong provided statements regarding the container. (*Id.*). Dailey noted he found trailer 238717 in the Chicago Ridge yard with the main two front metal anchor pins not engaged into the hold down points on the main cargo box locks of the trailer. (*Id.* at ¶ 69). Dailey further noted that two other drivers, Wiltfrong and Chuck Jager, observed the condition of the trailer and that the three of them properly secured the unit. (*Id.*). No photos of the unit were taken. (*Id.*). Wiltfrong confirmed that the container was sitting on the pins. (*Id.* at ¶ 70). The unit was deemed unsafe because the left and right front locking pins were not in a position to lock the container to the chassis. (*Id.* at ¶ 67). At the time Dailey and Wiltfrong discovered the container, they had no knowledge that Bluford had transported the unit because there was no way for an employee to know what unit was transported by which driver. (*Id.* at ¶ 71). The containers had no identifying marks to distinguish one from another other than the unit number. (*Id.*). Rood found out that Bluford had delivered trailer 238717 through Swift's computer system. (*Id.* at ¶ 70).

Bluford received a PCR terminating his employment on January 11, 2011 for failure to complete safety inspections and report a hazardous condition of trailing equipment and for transporting unsafe equipment. (*Id.* at ¶ 66). Rood told Bluford there was a record of him transporting a container to the Chicago Ridge facility when it was sitting on top of a pin. (*Id.*) As an intermodal driver, Bluford was required to follow FMCSA regulations. (*Id.* at. ¶ 7). FMCSA regulations require an intermodal driver to inspect his equipment and to identify and report any

defect or deficiency that would affect the safety of operation of the vehicle. (*Id.* at ¶ 21; *see* CFR § 396.11(a)(1-2)). FMCSA regulations also require that when transporting an intermodal container on container chassis vehicles, "[a]ll lower corners of the intermodal container must be secured to the container chassis with securement devices or integral locking devices that cannot unintentionally become unfastened while the vehicle is in transit." (*Id.*; *see* CFR § 393.126(b)(1)). Swift's Driver Manual contains similar policies addressing safety procedures, including a policy regarding pre-trip and post-trip inspections. (*Id.* at ¶ 20). Bluford received a copy of the Driver Manual. (*Id.* at ¶ 19).

An empty container weighs between 8,000 and 11,000 pounds and transporting a container that is not properly secured is extremely dangerous. (*Id.* at ¶ 74). Bluford was required to perform a pre-trip inspection that includes ensuring that a container is properly secured. (*Id.* at ¶ 73). The PCR terminating Bluford stated that on December 8, 2010, he failed to perform a pre-trip inspection and identify a hazardous condition of a load, failed to have it corrected before transport, and failed to perform a post-trip inspection and report the hazardous condition of the unit once dropped off at the Chicago Ridge facility. (*Id.* at ¶ 67). Bluford disputes that the container was not properly loaded but agrees that he transported the container to the Chicago Ridge yard and that a container sitting on top of pins is not properly secured to the chassis. (*Id.*; *Id.* at ¶ 73). Bluford disputes that he drove the container sitting up on a pin, alleging that: (1) the container likely would have fallen off if he had driven it unsecured; (2) containers are used frequently so it is unlikely that this container sat in the facility's yard for nearly a month; (3) another company may have used the container; and (4) Swift has an employee inspect the yard every day. (Pl. Resp. 56.1 St. ¶ 67). Bluford was told he was terminated for his failure to secure the container, but he believes he was terminated because he is African-American. (Pl. Resp. 56.1

St. ¶ 75; Def. 56.1 St. ¶ 76). Both Young and Rood have terminated other drivers for failing to secure a container to a chassis. (Def. 56.1 St. ¶ 75). Bluford is specifically aware that Latoya Milton and Angela Washington were both terminated for transporting a container sitting on top of its pins. (*Id.* at ¶ 77). Bluford is not aware of any employee who was not terminated after transporting an improperly secured container. (*Id.*).

## **LEGAL STANDARD**

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). Whether a fact is material depends on the underlying substantive law that governs the dispute, and a genuine dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted). If the moving party has properly supported its motion, the nonmoving party must come forward with facts that show there is a genuine issue for trial. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013). Where there are genuine disputes as to material facts, courts view those facts in the light most favorable to the nonmoving party when deciding motions for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The nonmoving party need not meet, in the court's eyes, the preponderance of the evidence standard, but must still provide more than a "mere scintilla" of evidence to show that there is a genuine issue of material fact. *See Chaib v. Ind.*, 744 F.3d 974, 981 (7th Cir. 2014). And when deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011).

## **DISCUSSION**

Bluford contends that Swift discriminated against him because of his race in violation of Title VII. Title VII makes it unlawful for an employer to "refuse to hire … or otherwise to discriminate against any individual … because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff in a Title VII case may prove a claim of race discrimination under either the direct or indirect method of proof. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). "In order to defeat summary judgment, the plaintiff one way or the other must present evidence that []he is in a class protected by the statute, that []he suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of [his] protected class, not for any noninvidious reason." *Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir.2012) (Wood, J., concurring).

Bluford proceeds under the direct method, but additionally states the standard for the indirect method in his response memorandum. Under the direct method, Bluford must provide either direct evidence or circumstantial evidence to prove that Swift's employment decision was the result of discrimination. *See Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). While direct evidence "does not require a virtual admission of illegality" or an explicit reference to the plaintiff's protected status, *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999), it is typically found in the form of an admission by the decision maker that he acted upon a discriminatory animus. *Phelan v. Cook Cty.*, 463 F.3d 773, 779 (7th Cir. 2006). Circumstantial evidence generally comes in three forms: "(1) ambiguous statements or behavior toward other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better

treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Mullin*, 732 F.3d at 777 (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010).

Under the indirect method, Bluford must first make out a prima facie case of discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which has four elements: he must demonstrate that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in his protected class were treated more favorably. *See Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). If Bluford establishes a prima facie case, then the burden shifts to Swift to articulate a legitimate, nondiscriminatory reason for any adverse employment action which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the action. *See Alexander*, 739 F.3d at 979. If Swift meets this burden, the burden returns to Bluford to prove, by a preponderance of the evidence, that the proffered reason is a pretext for race discrimination. *Id.* While the indirect approach is often called a "burden shifting" method, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*; *Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) (citation omitted).

**A. Direct Method**

Applying these principles, Bluford has failed to put forth sufficient direct or circumstantial evidence of race discrimination to satisfy the direct method of proof. Bluford offers no admissions that could be construed as direct evidence of discrimination, but alleges that

11

(1) Rood made one ambiguous statement, (2) Caucasian Intermodal Drivers were treated more favorably, and (3) Swift's reasons for terminating him were spurious. Here, Bluford has not produced enough evidence that a rational jury could conclude that Swift took any action against him because he is a member of a protected class.

### 1. Ambiguous Statement

Bluford first attempts to establish circumstantial evidence of discrimination by pointing to an alleged statement that Rood made before October 2010. Bluford maintains that on a single occasion he overheard Rood talking on the phone and say, "Man, I'm getting sick of coming up here babysitting these monkeys." (Def. 56.1 St. ¶ 39). Although Rood denies making the comment, the parties do not dispute that Rood never saw Bluford approach, Rood was not addressing Bluford, no one else was present, and that Bluford never raised the issue with either Rood or another supervisor. (*Id.* at ¶¶ 39-40). Additionally, Bluford admitted that he did not hear Rood or Young make any other race-based comments during the course of his employment. (*Id.* at ¶ 41).

Even accepting Bluford's version of the events and assuming that Rood made the comment, Rood's singular statement does not amount to evidence of discrimination. A remark can raise an inference of discrimination when it "was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)). However, "[i]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). Although Rood was involved in making the decision to terminate

Bluford and the comment was allegedly made at least two months before the first PCR and three months before the termination decision, it was not in reference to any employment action. *See Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1072 (7th Cir. 2012) ("[t]o be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." (internal quotation marks and citation omitted)). In fact, the alleged remark did not refer to a specific employee or group of employees and was not communicated intentionally to any Swift employee. While the statement is ambiguous, it does not reasonably create an inference that Rood harbored discriminatory bias toward Bluford. *See Steinhauer v. DeGolier*, 359 F.3d 481, 488 (7th Cir. 2004) (where comment not made to plaintiff and made in passing was unrelated to any employment decision, the plaintiff failed to present sufficient evidence of discriminatory intent); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001) (comments must be more than the random office banter or stray remark to constitute proof of discriminatory intent); *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993) (alleged discriminatory remarks, when unrelated to the employment decision in question, are not evidence that employer relied on illegitimate criteria). The fact that the racial composition at the Chicago Ridge location during Bluford's employment was nearly an even split between African-American and Caucasian drivers further supports this conclusion.

### 2. Better Treatment

Nor is there evidence that Swift employees outside of Bluford's protected class were systematically treated more favorably. A plaintiff can present circumstantial evidence of intentional discrimination by proving that similarly situated employees outside of the protected class systematically received better treatment. *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410

F.3d 387, 395-96 (7th Cir. 2005). Bluford alleges that he received less desirable assignments and worse trucks than similarly situated Caucasian drivers and that his supervisors verbally disparaged him. (Def. 56.1 St. ¶ 22). Bluford's contention is fatally flawed because he is unable to support his allegation that Caucasian drivers received better treatment than he did.

While Bluford alleges that he "sometimes" did not get good route assignments and that Intermodal Drivers at Swift's Manteno and Gary facilities received better routes than he did, he is entirely unaware of the identity or race of any driver who received better assignments. (*Id.* at ¶ 29). Bluford also believes that Young would occasionally reassign his pre-trips based on his race, but this argument is weak not only because Young himself is an African-American, *see Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 n.4 (7th Cir. 1997) (finding that fact that plaintiff's supervisor was of the same race as plaintiff cut against his pretext claim), but also because Bluford does not know the identities or races of the drivers to whom his routes were reassigned. (Def. 56.1 St. ¶ 26). The fact that Bluford is not aware of a single Swift driver who made money than he did further belies his allegations. (Def. 56.1 St. ¶ 31). In fact, Bluford described himself as "the number one man on the list as far as loads, miles, and deliveries." (*Id.*).

Likewise, Bluford's claim that Swift sent better trucks to the Gary and Manteno facilities rests on the faulty premise that those locations employed a lower proportion of African-Americans. It is undisputed that the Manteno facility had no Intermodal Drivers assigned during Bluford's employment, and both the Gary and Chicago Ridge facilities employed a majority of African-American drivers. (*Id.* at ¶ 34). Although Bluford contends that trucks in better working condition were assigned to drivers of noncolor, he admitted that Caucasian drivers were also assigned trucks that would break. (*Id.* at ¶ 32). Bluford further admitted that on the occasions he

received the least favorable trucks, he does not believe he was assigned those trucks because of his race. (*Id.* at ¶ 36).

Bluford's allegation that Rood verbally harassed him at least partially due to his race fails for the same reasons his arguments regarding route and truck assignments fail. Bluford acknowledged that he does not know whether Rood spoke in the same manner to others. (*Id.* at ¶ 51). Further, Bluford's specific allegations regarding his 2010 pickup assignment to Kenosha, his flat tire incident in Sturtevant, Wisconsin, his canceled assignment in Gary, Indiana, and Young's unfulfilled threat to write Bluford up for not driving a certain truck allow for no inference that similarly situated Caucasian employees systematically received better treatment. Bluford's arguments that Rood never testified that he called other drivers more than once or that Rood never offered any explanation about why he took Bluford off his original assignment in Gary are insufficient to survive summary judgment because it is Bluford's burden, not Swift's, to present some evidence that would allow a rational jury to infer intentional discrimination by Swift. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) (holding that a plaintiff must assert more than that defendant offered no evidence which would preclude a jury finding of discrimination to avoid summary judgment). As a whole, a review of the record does not contain sufficient evidence to support Bluford's contention that similarly situated Caucasian drivers were treated more favorably than he was.

### 3. Pretext

Similarly, to the extent that Bluford argues that Swift's reason for discharging him is pretextual, his evidence does not support that inference. Bluford was told he was terminated for transporting a container in a hazardous condition in violation of both federal law and Swift policy. (Def, 56.1 St. ¶ 75). Although Bluford disputes that he transported the container in an

15

unsafe condition, he must show that not only was Swift incorrect to fire him, but also that Swift lied about their reasons for doing so. *See Teruggi*, 709 F.3d at 661 ("[a]n unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie—not just an error, oddity, or oversight.' ") (quoting *Van Antwerp*, 627 F.3d at 298)). None of Bluford's evidence shows that Swift's stated reason for Bluford's discharge was a lie.

As a preliminary matter, Bluford's contention that he was "set up" for termination by the three incidents comprising the December 30, 2010 PCR is unfounded. While Bluford disputes that he committed the infractions leading to this initial PCR, it is undisputed that Rood terminated Bluford solely due to the safety ramifications of transporting an unsecured container. (Def. 56.1 St. ¶ 75). A plaintiff may present evidence of negative performance evaluations at the pretext stage to suggest that a defendant's legitimate reasons for a plaintiff's termination are unworthy of belief. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). bHowever, because the December 30, 2010 PCR was wholly unrelated to and played no factor in the termination decision, it is not evidence of pretext in regards to Bluford's termination. Bluford additionally attempts to cast doubt on the veracity of Swift's decision to terminate him by disputing that he drove the container in an unsecured position, specifically alleging that: (1) the container likely would have fallen off if he had driven it unsecured; (2) containers are used frequently so it is unlikely that this container sat in the facility's yard for nearly a month; (3) another company may have used the container; and (4) Swift has an employee inspect the yard every day. Because Bluford's arguments rest on unsupported speculation, maintain no connection to discriminatory intent, or are unsupported by the record, his claims cannot survive

summary judgment. *See Hutt v. AbbVie Prods., LLC*, 757 F.3d 687, 692 (7th Cir. 2014) (speculation about discrimination is not enough to avoid summary judgment).

Here, the parties do not dispute that on January 5, 2011, Glenn Dailey, an Intermodal Driver, told Driver Manager Ron Spain that he had encountered container 238717 in the Chicago Ridge yard in an unsafe condition with its two main front anchor pins disengaged from the hold down points on the locks of the trailer. (Def. 56.1 St. ¶¶ 67-69). Although no photos were taken, two other drivers, David Wiltfrong and Chuck Jager, confirmed the condition of the trailer. (*Id.* at ¶ 69). Of utmost importance, at the time the container was discovered, the drivers had no way of knowing who had transported the unit. (*Id.* at ¶ 71). Rood learned that Bluford had delivered trailer 238717 on December 8, 2010, only after checking Swift's computer records. (*Id.* at ¶ 70). Bluford admits in his response that the records show that Swift did not use the trailer from December 8, 2010, until Swift discovered the unit on January 5, 2011. Even though Rood testified that the containers were used frequently, the undisputed evidence shows that no Swift employee transported the unit between Bluford's delivery and the container's discovery.

Bluford's contentions that the container would have fallen off during the trip or that another company used it between his delivery and its discovery are entirely unsupported by the record and rely on speculation. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012) ("circumstantial evidence under the direct method of proof, which requires evidence leading *directly* to the conclusion that an employer was illegally motivated, without reliance on speculation"). While Bluford contends that the units are interchangeable and used by other companies, he has presented no records that any other company used this unit between his delivery and January 5, 2011. Finally, Bluford's argument that Swift inspected the yard daily misstates Young's testimony; Young testified that Dailey would inspect the yard weekly.

17

(Dkt. 56-3, Young Dep. pp. 95-96). Regardless, the existence of this procedure does not sufficiently show that Swift lied about its decision to terminate Bluford in light of the facts that: (1) the container's condition was not discovered by a decisionmaker, but by other Intermodal Drivers; (2) the drivers were unaware who had delivered the unit upon discovery; (3) Rood only found out Bluford had last delivered the unit upon a review of Swift's transportation records; and (4) no other Swift driver used the container between December 8, 2010 and January 5, 2011.

Even if Bluford's evidence showed pretext, that alone would not be sufficient to survive summary judgment under the direct method. *See Teruggi*, 709 F.3d at 661 ("Evidence offered under the direct method 'must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus.' ") (citation omitted). The record simply does not contain evidence of race-based animus. While Bluford expresses frustration over Swift's equipment and route assignments, his December 30, 2010 PCR, and his eventual discharge, the complaints do not point to discriminatory intent, either individually or collectively. At best, Bluford's evidence calls into question the wisdom of Swift's discharge decision. Yet this Court "is not ultimately concerned with whether [Swift] made the *right* decision when it terminated [Bluford's] employment"; rather, the inquiry is focused on whether Bluford has presented evidence from which a factfinder could make the reasonable inference that Swift made a discriminatory decision based on Bluford's race. *Id.* at 660. This Bluford has not done.

### B. Indirect Method

This Court need not analyze the record under the indirect method because Bluford's response memorandum does not raise it; accordingly, this argument is waived. *See Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) ("A failure to oppose an

argument permits an inference of acquiescence and 'acquiescence operates as waiver.' ") (quoting *Cincinnatti Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001)); *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and underdeveloped arguments … are waived). Here, Bluford states the standard for the indirect method of proof but goes no further in establishing the prima facie requirements. Because Bluford does not even attempt to set forth a prima facie case, any argument under the indirect method is waived.

Nevertheless, this Court notes that Bluford could not succeed under the indirect method, either. Under the indirect method of proof, Bluford must establish a prima facie case of discrimination, showing that (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) Swift treated similarly situated employees outside of the protected class (in this case, Caucasian employees) more favorably. *See Bass*, 746 F.3d at 841. Here, prong one is not contested: it is clear that Bluford, an African-American, was part of a protected class. Nor is prong three contested with respect to Bluford's termination. *See Haywood*, 323 F.3d at 532 (termination satisfies burden of demonstrating an adverse employment action). But in addition to the lack of evidence of systematic better treatment for similarly situated employees discussed under the direct method, Bluford is also unable to point to another employee who was not terminated for failing to properly secure a container. (Def. 56.1 St. ¶ 77). The fact that Bluford believes his termination was unwarranted is not enough to carry the day for him. His failure to prove this prong defeats any claim he may have had under the indirect method of proof. *See Chaib*, 744 F.3d at 984 ("[W]ithout similarly situated comparators, no inference of discrimination arises and [Plaintiff's] disparate treatment claims fail under the indirect method.").

## **CONCLUSION**

For the foregoing reasons, the Court grants Swift's Motion for Summary Judgment.

```
_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois
```

Date: September 15, 2014